IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES E. COOK,

     Petitioner,

     v.

STATE OF OHIO,

     Respondent.

Case No. 2:15-cv-02669
Judge Frost
Magistrate Judge King

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the *Petition* (ECF No. 4), Respondent's *Motion to Dismiss* (ECF No. 13), Petitioner's *Response in Opposition* (ECF No. 16), and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Respondent's *Motion to Dismiss* be **GRANTED** and that this action be **DISMISSED** as barred by the one-year statute of limitations under 28 U.S.C. § 2244(d).

### Facts and Procedural History

Petitioner was indicted by the May 11, 2007, term of the Franklin County grand jury on three counts of aggravated robbery, six counts of robbery, two counts of kidnapping, one count of having a weapon while under disability, and one count of safecracking, with firearm specifications.  *Exhibit 1* (ECF No. 13-1), *Indictment,* PageID# 110-18.  He was re-indicted by the May 9, 2008, term of the Franklin County grand jury on the six counts of robbery, with firearm specifications, in order to reflect a change in Ohio law.  *Exhibit 3*, *Indictment,* PageID# 121-25.  The trial court joined the cases for purposes of trial.  *See Entry,* PageID# 131.

The Ohio Tenth District Court of Appeals summarized the facts and procedural history as

follows:

> Defendant-appellant, James E. Cook ("appellant"), appeals from the judgments of the Franklin County Court of Common Pleas, entered upon a jury verdict convicting appellant of two counts of aggravated robbery, multiple counts of robbery, one count of kidnapping, and one count of safecracking, all with firearm specifications, and upon a finding of guilt by the trial judge as to one count of having a weapon under disability. For the following reasons, we affirm those judgments.
>
> Appellant's convictions arise from an incident that occurred on March 7, 2005, at 2781 Innis Road, in Columbus, Franklin County, Ohio. Kim Worthington ("Kim"), office manager of a family-owned residential moving company known as A Family Moving Company, had just arrived at work when two black men entered the office and shortly thereafter announced they were committing a robbery. The two men held Kim at gunpoint and forced her to unlock the company safe. The men took money and a handgun from the safe, along with Kim's wallet, cell phone, and other personal items. Then the men bound Kim with duct tape and forced her under a desk. They also duct taped another woman, Tina Kelly, who was living in the residential half of the building at 2781 Innis Road. The men then exited the building with the money and the handgun from the safe. As the two men were walking to their vehicle in the parking lot, Kim's husband, Mike Worthington ("Mike"), was pulling into the lot. He was unaware of the robbery until he entered the building and found Kim. Mike then attempted to track down the robbers, but was unsuccessful.
>
> The investigation into the robbery stalled for a significant period of time until it was learned that Deon Cheeks, a man facing various federal charges, had confessed to the robbery as part of a federal plea deal and had implicated appellant as his accomplice. Based upon this information, Franklin County Sheriff Detective Chris Floyd prepared two photo arrays. One array contained a photo of appellant, while the second array contained a photo of Deon Cheeks ("Cheeks"). Kim identified appellant as the robber with the gun but could not identify Cheeks.
>
> On September 12, 2007, appellant was indicted on three counts of aggravated robbery, three counts of second degree robbery, three counts of third degree robbery, two counts of kidnapping, and one count of safecracking. All of these counts were indicted with

firearm specifications. Additionally, appellant was indicted on one count of having a weapon while under disability.

This matter proceeded to jury trial on January 5, 2009 on all offenses except the one count of having a weapon while under disability, which was tried to the court. Prior to taking evidence at trial and outside the presence of the jury, the trial court held a hearing on appellant's motion to suppress identification, which alleged the photo array procedure was suggestive, unreliable, and utilized impermissible procedures.

Kim and Detective Floyd both testified at the suppression hearing. Kim testified that she was shown two photo arrays and that she identified appellant in one of those arrays as the man who held her at gunpoint during the robbery. Kim stated she had "[a]bsolutely no doubt" that she properly identified appellant as the robber with the gun. (Tr. 47.) She further testified that Detective Floyd never indicated to her which photo she should select. Detective Floyd testified as to how he prepared the "six-pack" photo arrays using the Identiview computer system. He stated Kim identified appellant without hesitation and that he did not influence her in any way. On cross-examination, he admitted he had never heard of the "double blind" photo array procedure and did not use that procedure here.

Following this testimony, the trial court overruled the motion to suppress the identification. The State of Ohio ("the State") then presented to the jury the testimony of five witnesses.

Kim testified that on the morning of the robbery, she received a phone call that had been forwarded from the office to her business cell phone. The caller asked to speak with Mike regarding a move that he was scheduling for his mother. Kim informed the caller that Mike was not available and the caller indicated he would try back later.

When Kim arrived at the office a short while later, around 9:00 a.m., she made a few trips between her car and the building as she carried things inside. During this process, she observed two men in a car driving down the driveway, but did not give it a second thought as she continued into the building. She had just opened the business when two men, later identified as appellant and Cheeks, entered the business. One of the men stated he had called earlier about a move. Kim recognized his voice as the man with whom she had just spoken. The man again asked for Mike and Kim informed him Mike was not available. The man then asked to

schedule the move on a specific date. As Kim was looking at the calendar, one of the men informed her they were there to commit a robbery.

Appellant, whom Kim described as the heavier of the two men, had a handgun, which Kim described as a black revolver, similar to the one shown to her in court. She kept her attention focused on appellant, since he was the man holding a gun on her. Appellant kept the gun pointed at Kim and sometimes waived it in the air. Both men kept asking where the money was kept. Kim gave appellant the combination to the safe, but appellant forced her to get on her knees and open the safe. Once she opened the safe, the thinner man without the gun (Cheeks) used duct tape to restrain her and forced her to lie on the floor while appellant searched the safe.

Appellant retrieved a bag of money and a handgun which belonged to Mike. Kim described that gun as a light colored 9 mm or a .45, similar to the second gun shown to her in court. Appellant continued to demand she get the other bag of money, but Kim insisted there was no other bag of money. The men also went through her purse and took her wallet and cell phone. In addition, the robbers repeatedly asked Kim if there was anyone else in the building. Although she initially said no, she eventually told them there was a woman living in the residential part of the building. The robbers then restrained that woman, Tina Kelly, with duct tape and forced Kim under the desk. She was afraid the men were going to shoot her because they were not wearing masks and their faces were visible. However, they left the building, locking the door behind them.

Kim testified she was able to partially free herself and free Tina Kelly, and within moments, Mike arrived. She reported the robbery to him and he chased after the suspects while she called the police.

Kim identified appellant in court as the robber with the gun and also reaffirmed her identification of appellant via a police photo array first shown to her on July 18, 2007, approximately two and one-half years after the robbery. She stated the detective never suggested to her which photo she should select and she was 100 percent certain in her identification. She also testified that she had not recognized anyone in the other photo array (which contained a photo of Cheeks) shown to her on that same date.

Upon cross-examination, Kim estimated the duration of her contact with the men during the robbery as 10 to 15 minutes. She also identified a computer-generated sketch she had assisted the police

in creating shortly after the robbery, which depicted a purported image of the robber brandishing the gun.

Mike testified he arrived at A Family Moving Company on March 7, 2005, around 10:00 or 11:00 a.m. As he drove down the driveway in his work truck, he observed two black men exiting the office door. He described one as heavy and the other as tall and thin. He observed the men get into an older model vehicle and drive away.

When Mike reached the office he discovered the door was locked, so he used his key to let himself into the building. Inside he found Kim still partially duct taped. She was shaking and crying. Kim informed him they had just been robbed. Upon hearing this, Mike testified he ran outside and tried to chase after the men in his truck, but could not locate them.

Mike testified he was shown two photo arrays in July 2007 but was unable to identify anyone. Mike also described the handgun he kept in the safe at A Family Moving Company as a black, .45 caliber, semi-automatic handgun with a clip. He recalled placing the gun in the safe the night before the robbery. He testified that his gun was operable and capable of being fired and expelling a projectile. During trial, he was shown a .45 semi-automatic, which he testified he believed was his gun, based upon the gun's black rail and the unusual type of ammunition found inside the gun.

Officer Adam Hicks of the Columbus Division of Police testified that on May 1, 2005, he initiated a traffic stop on an older model vehicle where the driver failed to signal. Appellant was later identified as a passenger in that vehicle. Officer Hicks testified that, as he approached the vehicle, appellant was moving about as if he was attempting to hide or retrieve an object. Officer Hicks removed the driver of the vehicle, whom he described as a thin, black male, in order to pat him down. As Officer Hicks was walking the driver back to the cruiser, the driver escaped and was never apprehended. In conducting an inventory search of the vehicle, the police discovered two loaded firearms, a black or gray .45 caliber Smith & Wesson and a black .38 caliber Smith & Wesson. Officer Hicks identified those weapons during the trial.

On cross-examination, Officer Hicks testified he later learned the driver who had escaped was Cheeks. He further testified that he requested firearms testing and fingerprint testing on the recovered weapons but never received any results.

5

Detective Chris Floyd testified that he responded to the robbery scene on Innis Road and later became the lead detective in April 2007 after the original detective transferred to another division. Detective Floyd stated he received a summary from an FBI agent which provided the names of two potential suspects, appellant and Cheeks. Based upon that information, he developed two photo arrays using those suspects.

Detective Floyd described the procedure for compiling the photo array. Initially, he used a computer program which allowed him to enter various physical characteristics that matched the characteristics of appellant. The computer system then selected a pool of potential photographed individuals who displayed characteristics similar to those of appellant. From that pool of photos, Detective Floyd ultimately selected five photos of men with physical characteristics similar to appellant to be included in the six-person photo array with appellant. He repeated the procedure for Cheeks. Detective Floyd testified he showed the photo arrays to Kim and Mike separately. Kim selected appellant as one of the robbers but did not identify Cheeks. Detective Floyd testified that Kim identified appellant without hesitation, but Mike was unable to identify anyone from either photo array.

Cheeks testified he is currently a federal prisoner incarcerated in Allenwood, Pennsylvania, and he is scheduled to be incarcerated until 2020. Cheeks testified about the federal proffer he provided to the United States Attorney's office in Toledo, Ohio after he was arrested for bank robbery charges. In September 2005, Cheeks agreed to cooperate with the federal government and confessed to his involvement in various armed robberies, including the armed robbery at A Family Moving Company. Cheeks also revealed that appellant had been his accomplice during that robbery. Cheeks positively identified appellant in court during the trial.

Cheeks testified he and appellant received information about A Family Moving Company from an alleged former employee who indicated there was money in the safe inside the office. The former employee also warned the men not to conduct the robbery if Mike was present. Based on this information, Cheeks and appellant developed a plan to rob the moving company.

While driving to the business, they called the moving company to ensure Mike was not present. Upon arrival, they entered through the back door and found a woman with dark hair (Kim). After again confirming that Mike was not present, appellant pulled out a handgun and ordered the woman to get down on the floor. They

restrained her with duct tape. Then Cheeks went to the next room and located a second woman and her dogs. He could not remember whether or not he used duct tape to restrain the second woman. During that time, appellant remained with Kim and obtained the money from the safe, which totaled over $1,500. Cheeks soon learned appellant had also removed a handgun from the safe.

Cheeks testified the entire encounter lasted 10 or 15 minutes. When he and appellant left the building, Kim was tied up on the floor with duct tape. Once he was outside, Cheeks observed a truck coming down the driveway. As they were leaving, Cheeks saw a white male in his late 30s or early 40s exit the truck and enter the building. Cheeks and appellant later split the money and each man took one of the guns.

Several weeks later, Cheeks and appellant were pulled over by Columbus police for a traffic violation. Cheeks was the driver of the vehicle and appellant was the front seat passenger. Cheeks provided the officer with a fake identification. Because Cheeks and appellant were moving around in the vehicle, the officer wanted to search the vehicle. Cheeks testified the two firearms used and/or taken during the robbery were in Cheeks' vehicle during the traffic stop. Consequently, Cheeks testified he took off running but appellant remained behind and was arrested for the two handguns. During the trial, Cheeks identified the gun used in the robbery, as well as the gun taken from the safe.

Cheeks testified that as a result of his cooperation with the federal government, he received a reduced federal sentence. Had he not cooperated with the federal government, he would have been facing a federal sentence of 151 to 188 months. Due to his cooperation, his criminal offense level under the federal sentencing guidelines was reduced and his potential sentence was reduced to 92 to 115 months. He ultimately received a sentence of 92 months.

Cheeks testified he did not know appellant was facing charges out of this incident or that he had been subpoenaed to testify until just a few days before the trial was scheduled to begin. Although he received no promises from the State with respect to his testimony in the trial against appellant, Cheeks testified that he hoped to use this continued cooperation to petition for a further reduction in his federal sentence.

On cross-examination, Cheeks admitted he believed he should receive a further reduction of his 92-month sentence in exchange for his testimony and that he, in fact, would seek a reduction of 92

months, which would thereby completely eliminate his sentence in the federal bank robbery case. He further admitted that he had not been charged with any offenses arising out of the robbery that occurred at A Family Moving Company. In addition, he admitted he received a benefit from the federal government because of his confession regarding his involvement in this and various other crimes.

After the State rested, the trial court dismissed the aggravated robbery and two robbery counts relating to Tina Kelly, pursuant to Crim.R. 29. The defense then rested without presenting any witnesses. On January 9, 2009, the jury returned guilty verdicts on all of the remaining counts and the corresponding specifications, except for the kidnapping count relating to Tina Kelly. The trial judge subsequently found appellant guilty of having a weapon while under disability. Appellant received a total aggregate sentence of 23 years of incarceration.

Appellant filed a timely appeal, asserting the following assignments of error for our review:

ASSIGNMENT OF ERROR ONE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND DEPRIVED DEFENDANT-APPELLANT OF DUE PROCESS OF LAW BY ENTERING A JUDGMENT OF CONVICTION AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.

ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PREJUDICIAL ERROR BY ADMITTING EVIDENCE OF AN UNRELIABLE IDENTIFICATION BASED UPON AN UNNECESSARILY SUGGESTIVE METHOD OF PRESENTING A PHOTO ARRAY.

ASSIGNMENT OF ERROR THREE

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PREJUDICIAL ERROR BY ADMITTING EVIDENCE OF AN UNRELIABLE IDENTIFICATION BASED UPON THE IDENTIFICATION OF THE DEFENDANT BY A WITNESS RECEIVING CLEAR AND SUBSTANTIAL BENEFIT FOR HIS TESTIMONY.

*State v. Cook*, Nos. 09AP316-17, 2010 WL 2396563, at *1-6 (Ohio App. 10th Dist. June 15, 2010). On June 15, 2010, the appellate court affirmed the judgment of the trial court. *Id*. Petitioner apparently never filed an appeal to the Ohio Supreme Court.

Approximately two years later, on June 27, 2012, Petitioner filed a petition for post conviction relief in the state trial court. On July 13, 2012, the trial court denied the petition as untimely. *Exhibit 16* (ECF No. 13-1), *Decision and Entry Denying Defendant's June 27, 2012 Petition for Post Conviction Relief,* PageID# 267. Petitioner initiated a timely appeal. *Exhibit 17*, *Exhibit 18* (ECF No. 13-1),PageID# 268-69.[1] On September 10, 2012, the appellate court granted Petitioner additional time in which to file his appellate brief, along with a motion and affidavit demonstrating good cause for the late filing, and warning him that his appeal could be dismissed. *See Exhibit 27,* (ECF No. 13-1), *Memorandum Decision on Application for Reconsideration*, PageID# 297-99. On September 19, 2012, the appellate court *sua sponte* dismissed the appeal due to Petitioner's failure to file an appellate brief. *Exhibit 20* (ECF No. 13-1), *Journal Entry of Dismissal,* PageID# 271. On September 24, 2012, Petitioner filed a motion for extension of time in which to file an appellate brief, which the appellate court denied. *See Exhibit 27, Memorandum Decision on Application for Reconsideration*, PageID# 298.

Almost two years later, on June 9, 2014, Petitioner filed a copy of his appellate brief, which was docketed as a motion to reconsider. *See id.* at PageID# 298. On June 13, 2014, the appellate court denied the motion as untimely. *Exhibit 23* (ECF No. 13-1), *Journal Entry,* PageID# 285. Petitioner sought reconsideration and, on August 14, 2014, the appellate court denied that motion. Exhibit 27 (ECF No. 13-1), *Memorandum Decision on Application for Reconsideration,* PageID# 297-99.

---

[1] The cases were consolidated for review. *Exhibit 10* (ECF No. 13-1), *Journal Entry,* PageID# 141.

On October 3, 2014, Petitioner filed a motion for delayed appeal of the trial court's July 13, 2014, denial of his petition for post conviction relief. Exhibit 28 (ECF No. 13-1), *Motion for Delayed Notice of Appeal,* PageID# 300-26. The appellate court denied the motion for delayed appeal. *Exhibit 32* (ECF No. 13-1), *Journal Entry of Dismissal,* PageID# 338. On April 29, 2015, the Ohio Supreme Court declined to accept jurisdiction of Petitioner's appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). *Exhibit 36* (ECF No. 13-1), *Entry,* PageID# 383. On January 28, 2015, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). Exhibit 37 (ECF No. 13-1), *Motion Pursuant to Ohio Appellate Rule 26(B)(1) Delayed Consideration,* PageID# 384-415. The appellate court denied Petitioner's Rule 26(B) application as follows:

> On January 28, 2015, appellant filed a motion for reopening pursuant to App.R. 26(B). App.R. 26(B) is intended to provide a vehicle for criminal defendants to raise claims of ineffective assistance of appellate counsel. Here, however, appellant does not seek to raise a claim of ineffective assistance of appellant [sic] counsel, but seeks to raise challenges to the trial court's July 13, 2012, decision and entry denying his petition for post-conviction relief. Because these arguments are not properly raised in an application for reopening filed pursuant to App.R. 26(B), appellant's application is denied.

*Exhibit 39* (ECF No. 13-1), *Journal Entry of Dismissal,* PageID# 421. On April 29, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4) and denied Petitioner's motion for stay of the lower court proceeding. *Exhibit 43* (ECF No. 13-1), *Entry,* PageID# 444.

Petitioner filed this action on July 31, 2015, alleging that he was denied his right to a speedy trial (claims one and two); that he was denied his right to a speedy trial pursuant to the interstate agreement on detainers act (claim three); that he was denied the effective assistance of trial counsel based on his attorney's failure to raise an issue regarding the denial of Petitioner's

right to a speedy trial, failure to file a motion to suppress evidence, and failure to request a missing witness charge (claim four); that he is actually innocent based on a newly discovered exculpatory expert theory of evidence challenging eyewitness identification testimony (claim five); that he was denied the effective assistance of appellate counsel based on his attorney's failure to advise him of the time limits for filing a petition for post conviction relief (claim six); that he was denied his right to the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim regarding the denial of the right to a speedy trial (claim seven); and that he was denied the effective assistance of appellate counsel based on his attorney's failure to raise on appeal a claim regarding the denial of the effective assistance of trial counsel (claim eight).  Respondent contends that this action must be dismissed as barred by the one-year statute of limitations pursuant to 28 U.S.C. § 2244(d).

**Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year statute of limitations on the filing of habeas corpus petitions. 28 U.S.C. § 2244(d).

> (d) (1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id*.

Under the terms of 28 U.S.C. § 2244(d)(1)(A), Petitioner's judgment of conviction became final on July 30, 2010, *i.e.*, forty-five days after the appellate court's June 15, 2010, dismissal of his appeal, when the time for filing a timely appeal to the Ohio Supreme Court expired. *See Searcy v. Carter*, 246 F.3d 515, 518-19 (6 Cir. 2001). *See also Marcum v. Lazarof*, 301 F.3d 480, 481 (6th Cir. 2002); *Sudberry v. Warden, Southern Ohio Correctional Facility*, No. 1:14-cv-676, 2015 WL 4078106, at *1 (S.D. Ohio July 6, 2015). The statute of limitations began to run the following day and expired one year later, on July 31, 2011. Yet Petitioner waited until July 20, 2015, - almost four years later - to execute the *Petition*. Further, none of Petitioner's collateral filings (the first of which was filed on June 27, 2012) tolled the running of the statute of limitations under 28 U.S.C. § 2244(d)(2) because the state courts dismissed those filings as untimely. *See Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2008)("[T]ime limits, no matter their form, are 'filing' conditions," and where the state court rejects a post conviction or collateral action as untimely, it is not "properly filed" so as to toll the running of the statute of limitations under § 2244(d)(2); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004)(*per curiam*)(concluding that a motion for a delayed appeal denied by the Ohio Supreme Court as untimely does not toll the running of the statute of limitations under § 2244(d)(2). Moreover, the statute of limitations had already expired prior to the time that Petitioner filed those actions. *See Vroman v. Brigano,* 346 F.3d 598, 602 (6th Cir. 2003)("The tolling provision does not. . . 'revive' the limitations period (*i.e.,* restart the clock at zero); it can only serve to pause a clock

that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations.").

Petitioner asks the Court to equitably toll the running of the statute of limitations, arguing that his attorney failed to advise him of the time limitations for filing a petition for post conviction relief or of the Ohio rules of procedure.  He asserts that his *pro se* incarcerated status justifies equitable tolling of the statute of limitations, and represents that he has been without legal training or the assistance of counsel since the time of his direct appeal. Petitioner also notes that he is in federal custody, and without access to Ohio law.[2]  Petitioner insists that he has acted diligently in pursuing his post conviction rights: he attempted to contact his appellate counsel, but was unable to speak with his attorney over the telephone.  He also attempted to obtain advice from the Clerk of Court, the "Review Case Research Program, Inmate Advocacy Group," and the public defender's office.  He sought assistance from a paralegal in connection with the filing of his state post conviction petition, but that person failed to file the petition after advising Petitioner that he would do so.  When Petitioner wrote to the public defender's office, he learned that the time for filing a petition for post conviction relief had already expired.  Petitioner also insists that he filed a timely post conviction brief with the Ohio Court of Appeals.  *See generally Response in Opposition*.

Petitioner has also attached various documents in support, including several letters from his appellate counsel.  (ECF No. 16-2). In a letter dated September 11, 2009, his attorney advised Petitioner that he could pursue a petition for post conviction relief if he wanted to introduce new evidence in support of his claims, and told him to contact the public defender's office regarding the filing of such a motion.  *Id.* at PageID# 1053.  A letter dated June 17, 2010, indicates that

---

[2] Petitioner is currently in federal custody, although he remains subject to future custody in Ohio in connection with the convictions that are the subject of this action.  *See Respondent's Motion to Dismiss*, PageID# 83.

appellate counsel had sent Petitioner a copy of the trial transcripts and would forward a copy of the appellate court's decision upon its receipt.  Appellate counsel advised Petitioner at that time that Petitioner could file a petition for post conviction relief in order to submit evidence not available at the time of trial.  Appellate counsel also advised Petitioner that he did not handle such matters.  *Id.* at PageID# 1055.  Petitioner also has attached a document dated August 8, 2010, that he apparently received from the National Inmate Advocacy Program; a copy of an August 23, 2010, request for the appointment of counsel made by him, *id.* at PageID# 1057; a letter dated August 30, 2010, sent by Petitioner to the Clerk of the Franklin County Court of Appeals requesting a "'post conviction relief' habeas corpus form," and instructions for the filing of such action, *id.* at PageID# 1058; a letter dated January 11, 2011, from the Office of the Federal Public Defender indicating that it could not assist him in the filing of a § 2254 petition unless appointed by the Court, *id.* at PageID# 1059; and a letter dated December 15, 2011, from the Office of the Franklin County Public Defender advising Petitioner that it could not assist him or provide him with advice regarding the time limitations for filing collateral actions, *id.* at PageID# 1060.[3]

The AEDPA's limitations period is not jurisdictional and is subject to equitable tolling. Equitable tolling of the statute of limitations, however, is granted sparingly in habeas cases.  *See Hall v. Warden, Lebannon Corr. Inst*., 662 F.3d 745, 749 (6th Cir. 2011).  In order to establish entitlement to equitable tolling, a petitioner must establish that (1) he has been pursuing his rights diligently and (2) some extraordinary circumstance stood in his way and prevented him

---

[3] The letter also indicates that the public defender's office advised Petitioner as follows:

> If you wish to go to federal court, you must first exhaust your remedies in state court.  This means seeking review from the highest appellate court in the state, but does not necessarily require filing a 26(B) motion or seeing [sic] postconviction relief.  If your case was decided in 2010 you may already be past the deadline for filing in federal court.

*Exhibit 16-2* (ECF No. 16), PageID# 1060.

from filing in a timely fashion. *Holland v. Florida*, 560 U.S.641, 649 (2010)(citing *Pace*, 544 U.S. at 418)). The petitioner bears the burden of demonstrating that he is entitled to equitable tolling. *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011).

The Supreme Court has allowed equitable tolling where a claimant actively pursued judicial remedies by filing a timely, but defective, pleading or where he was induced or tricked by his opponent's misconduct into allowing the filing deadline to pass. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). Where the claimant failed to exercise due diligence in preserving his legal rights, courts are much less forgiving. *Id*.; *Jurado v. Burt,* 337 F.3d 638, 642–13 (6th Cir. 2003). A prisoner's *pro se* incarcerated status, lack of knowledge regarding the law, and limited access to the prison's law library or to legal materials do not provide a sufficient justification to apply equitable tolling of the statute of limitations. *Hall*, 662 F.3d at 751 (citation omitted). These are conditions typical for many prisoners and do not rise to the level of exceptional circumstances. *Groomes v. Parker*, No. 3:07–cv–0124, 2008 WL 123935, at *5 (M.D.Tenn. Jan.9, 2008) (citing *Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004)). Similarly, bad advice from a fellow inmate or other non-lawyers does not constitute grounds for equitable tolling of the statute of limitations. *Allison v. Smith*, No. 2:14–cv–10423, 2014 WL 2217238, at *5 (E.D.Mich. May 29, 2014) (citing *Smith v. Beightler*, 49 F. App'x 579, 580–81 (6th Cir. 2002); *United States v. Cicero,* 14 F.3d 199, 204–05 (D.C.Cir. 2000); *Henderson v. Johnson*, 1 F.Supp.2d 650, 655 (N.D.Tex.1998)). A "[p]etitioner's reliance on jailhouse lawyers is not an extraordinary circumstance warranting equitable tolling." *Arriaga v. Gonzales*, No. 13–1372–AG (JPR), 2014 WL 5661023, at 12 (C.D.Cal. Oct.31, 2014) (citations omitted). "Generally, a habeas petitioner's reliance on unreasonable or incorrect legal advice from his attorney is not a valid ground for equitable tolling of the statute of limitation." *Brown v. Bauman*, No. 2:10–cv–

264, 2012 WL 1229397, at *9 (W.D.Mich. April 12, 2012) (citations omitted).  "The fact that Petitioner may be ignorant of the law and instead chose to rely on counsel, in itself, does not provide a basis for equitable tolling. Neither a prisoner's *pro se* status nor his lack of knowledge of the law constitute[s] extraordinary circumstances justifying equitable tolling."  *Taylor v. Palmer*, No. 2:14–cv–14107, 2014 WL 6669474, at *4 (E.D.Mich. Nov.11, 2014) (citing *Rodriguez v. Elo,* 195 F.Supp.2d 934, 936 (E.D.Mich. 2002); *Johnson v. United States*, 544 U.S. 295, 311 (2005) ("[W]e have never accepted *pro se* representation alone or procedural ignorance as an excuse for prolonged inattention when a statute's clear policy calls for promptness")). "Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."  *Lawrence v. Florida*, 549 U.S. 327, 336–37 (2007) (citation omitted).  In *Holland*, 560 U.S. 631, the Supreme court held that egregious misconduct by an attorney may constitute an extraordinary circumstance warranting equitable tolling of the statute of limitations, but noted that a "garden variety claim of excusable neglect," such as a miscalculation that leads a lawyer to miss a filing deadline, would not justify the equitable tolling of the statute of limitations.  *Id.* at 651-52 (citations omitted).

The record in this action does not justify the equitable tolling of the statute of limitations. Appellate counsel's alleged failure to advise Petitioner of the time limitations for filing a state petition for post conviction relief does not rise to the level of egregious attorney misconduct sufficient to justify the equitable tolling of the statute of limitations.  Although Petitioner provides lengthy explanations for his failure to comply with Ohio's procedural rules, Petitioner fails to explain his lengthy delay in pursuing federal habeas corpus relief.  The record does not demonstrate that Petitioner acted with diligence or that an extraordinary circumstance prevented

his timely filing.   Petitioner executed this habeas corpus petition almost four years after the statute of limitations had expired.  By his own account, the Franklin County Public Defender advised him, in a letter dated December 15, 2011, that he did not need to file state post conviction or collateral actions in order to file a federal habeas corpus petition, and advised Petitioner that the statute of limitations for the filing of a § 2254 petition may have already expired.  *See* ECF No. 16-2, PageID# 1060.  Still, Petitioner did not execute this *Petition* until July 20, 2015.  Nothing prevented him from doing so earlier.

Neither *Gunner v. Welch*, 749 F.3d 511 (6th Cir. 2014), nor *Paris v. Turner,* 187 F.3d 637, unpublished, 1999 WL 357815 (6th Cir. June 28, 1999), referred to by Petitioner, support his claim for equitable tolling of the statute of limitations.  In *Gunner,* the United States Court of Appeals for the Sixth Circuit held that, where an attorney performs in a constitutionally ineffective manner by failing to advise his client of the time limitations for filing a state post conviction petition, the petitioner may establish cause for his procedural default.  *Paris v. Turner* also involves a claim of ineffective assistance of counsel as cause sufficient to excuse the procedural default.  The Sixth Circuit concluded that the petitioner had established cause for his procedural default where his appellate attorney had failed to provide him with any guidance on how to further appeal, and the public defender's office, which placed the petitioner on a three year waiting list, failed to inform him that he was in danger of a procedural default.  *Id*. at *3. Neither of these cases involve the running of the statute of limitations under 28 U.S.C. 2244(d), or the circumstances at issue here.

Petitioner also contends that his actual innocence justifies the equitable tolling of the statute of limitations.  In support of this contention, he maintains that prosecution witness Deon Cheeks lied because the prosecutor promised Cheeks leniency in exchange for his testimony

against Petitioner.  Referring to inconsistencies in the trial testimony, Petitioner argues that the evidence is insufficient to establish his guilt.  He asserts that his newly discovered evidence involves his attorney's failure to call a defense expert to testify on the unreliability of eyewitness identification.

The one-year statute of limitations may equitably tolled upon a "credible showing of actual innocence."  *Souter v. James*, 395 F.3d 577, 602 (6th Cir. 2005).  Accordingly, "a petitioner whose claim is otherwise time-barred may have the claim heard on the merits if he can demonstrate through new, reliable evidence not available at trial, that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Yates v. Kelly*, No. 1:11–cv–1271, 2012 WL 487991 (N.D.Ohio Feb.14, 2012) (citing *Souter,* 395 F.3d at 590).  Actual innocence means factual innocence, not mere legal insufficiency.  *See Bousely v. United States*, 523 U.S. 614, 623 (1998).

The sole issue before this Court is whether the one-year statute of limitations bars this case from review, or whether Petitioner can establish that equitable tolling nonetheless permits review of his claims.  Neither the evidence introduced at trial nor the credibility of prosecution witnesses constitutes the sort of new evidence that is required to support a claim of actual innocence.  *See Snyder v. Warden, Marion Correctional Inst.*, No. 2:11–cv–800, 2013 WL 3367864, at *1 (S.D.Ohio July 5, 2013)(evidence already presented at trial or available at that time does not constitute new evidence of actual innocence)(citing *Lenoir v. Warden, Southern Ohio Correctional Facility*, 886 F.Supp.2d 718, 729 (S.D.Ohio 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)); *see also Gulertekin v. Tinnelman–Cooper*, 340 F.3d 415, 427 (6th Cir.2003)); *Stout v. Warden, Toledo Correctional Inst.*, 2014 WL 1682824, at *11 (N.D. Ohio April 17, 2014)(citing *Schlup,* 513 U.S. at 327)(same)).  Petitioner's assertion that a defense

18

expert on the unreliability of eyewitness identification would have assisted him, or that the record shows that his identification by the victim as the perpetrator was unreliable in this case do not establish his actual innocence so as to justify equitable tolling of the statute of limitations.

Therefore, the Magistrate Judge **RECOMMENDS** that this action be DISMISSED as untimely.

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

                                                   _s/ Norah McCann King_
                                                   Norah McCann King
                                                   United States Magistrate Judge
                                                   January 29, 2016